William **THOMAS**, et al., Plaintiffs,

v.

**NEWS WORLD COMMUNICATIONS**, et al., Defendants.

**Civ. A. No. 87–1820–LFO.**

United States District Court, District of Columbia.

Feb. 23, 1988.

William Thomas, pro se.

Jay Young, pro se.

Allen V. Farber, James A. Barker, Jr., Schwalb, Donnenfeld, Bray & Silbert, Washington, D.C., for defendants News World Communications, De Borchgrave and Pak.

Michael L. Martinez, Asst. U.S. Atty., Washington, D.C., for Federal defendants.

## MEMORANDUM

OBERDORFER, District Judge.

*Pro se* plaintiffs William Thomas, Ellen Thomas, Concepcion Picciotto, and Robert Dorrough, individually and as organized, in various combinations, into the "White House Antinuclear Vigil" and the "Peace Park Anti–Nuclear Vigil," sue numerous official and private individuals and organizations for injuries allegedly arising out of plaintiffs' communicative activities in Lafayette Park.

On July 7, 1987, plaintiffs filed a complaint accompanied by a Motion for Preliminary Injunction and a Temporary Restraining Order naming as defendants, *inter alia,* President Ronald Reagan; the Reverend Sun Myung Moon, News World Communications, doing business as *The Washington Times,* along with several of the newspaper's principals and employees; Jay Young, a political activist; the Young Americans for Freedom ("YAF"); Donald Hodel, in his official capacity as Secretary of the Interior; two assistant solicitors in the Department of the Interior; two particular United States Park Police officers; and "Numerous Identifiable Agents of the United States Secret Service and the United States Park Police." Plaintiffs seek damages from all defendants totalling more than $150 million. In addition, plaintiffs pray for declaratory and injunctive relief against the enforcement of regulations presently codified at 36 C.F.R. § 7.96. Complaint at 29.

Two separate dispositive motions have been filed. News World Communications and defendants related to that organization (hereinafter *"Times* defendants") have filed a motion to dismiss. The federal defendants have filed a motion to dismiss or for summary judgment. For the reasons

discussed in this Memorandum, an accompanying Order grants the *Times* defendants' motion to dismiss for failure to state a claim upon which relief can be granted.

### I.

Plaintiffs have attempted to maintain a continuous anti-nuclear demonstration in front of the White House, along Pennsylvania Avenue, and in Lafayette Park, Washington, D.C. One of the individual plaintiffs commenced his vigil in 1981; others joined periodically throughout the following six years.

Accompanied by signs bearing political and religious messages, and supplied with literature expressing and advocating various ideological views, plaintiffs have sought

> to attract the attention of the general public, intending to communicate a message of broad public concern and to notify the general public of the availability of free intellectual discourse.

Complaint at ¶ 23. Plaintiffs summarize their message as one of " 'Peace through Love,' " and " 'love your enemies.' " *Id.* at ¶ 25. Those principles find practical application, plaintiffs maintain, in their conviction that " 'unless humanity eliminates nuclear weapons, nuclear weapons will eliminate humanity.' " *Id.*

Plaintiffs' continuous vigil has been interrupted numerous times over the years by warnings, arrests, and convictions for violations of Department of the Interior regulations restricting the time, place, and manner of First Amendment activity near the White House and on federal park lands, such as Lafayette Park. In particular, the plaintiffs have run afoul of prohibitions on "camping" in the Park, codified at 36 C.F.R. § 7.96(i)(1) (1987). That rule defines the proscribed activity, in part, as

> the use of park land for living accommodation purposes such as sleeping activities, or making preparations to sleep . . . or storing personal belongings. . . .

36 C.F.R. § 7.96(i)(1) (1987). In addition, plaintiffs have been cited for violations of Lafayette Park restrictions governing the size and the structure of signs, as well as

sign attendance requirements, which regulations are codified at C.F.R. § 7.96(g)(5)(x)(B) (1987).

In 1984, plaintiffs filed suit against Department of the Interior officials challenging the constitutionality of these regulations as violative of plaintiffs' First Amendment rights of speech and association. In July of 1987, plaintiffs filed a second action, re-alleging many of their earlier challenges to the camping regulations and adding new challenges to a three-foot attendance sign regulation that had been promulgated since the filing of the original suit. The 1987 complaint, however, named as defendants not only federal officials and Park Police officers, as had the original complaint. The 1987 complaint also alleged that constitutional and common law torts had been committed against plaintiffs by *The Washington Times*, its parent company, News World Communications, its editor-in-chief, and various employees and associates of the newspaper, alone and in conspiracy with each other and the federal defendants.

The federal defendants sued in the 1984 action have filed a motion to dismiss, or, in the alternative, for summary judgment on that complaint. The federal defendants in the 1987 case have also filed a motion to dismiss or for summary judgment. Three defendants affiliated with *The Washington Times* have filed a joint motion to dismiss the 1987 complaint as against them. *See* Defendants News World Communications, DeBorchgrave and Pak's Memorandum in Support of Motion to Dismiss (hereinafter *"Times'* Motion to Dismiss"). Defendant Jay Young has filed an answer, which denies all allegations of wrongdoing and, like the motion filed on behalf of all other *Times* defendants, argues that plaintiffs have failed to state a claim upon which relief can be granted.

This Memorandum and accompanying Order address only those claims made by plaintiffs against the nonfederal defendants. They dispose only of the *Times* defendants' motion to dismiss the 1987 complaint. The federal defendants' dispositive

motions in both the 1984 and the 1987 actions remain under advisement.

For the purposes of the present Memorandum, defendant Young's answer shall be treated as incorporating the other *Times* defendants' motion to dismiss; the resolution of the *Times* motion shall apply as well to all claims against defendant Young. Defendant Sun Myung Moon has filed neither an answer nor any other responsive pleading. Similarly, no response has been received from defendant Masty nor from defendant organization YAF. Accordingly, the 1987 complaint's allegations against these two parties also remain under advisement.

## II.

The 1987 complaint claims that defendants have acted, individually and in conspiracy with one another, to infringe plaintiffs' First Amendment rights. Specifically, plaintiffs allege that defendants "utilize[d] regulatory schemes, disinformation, psychological violence, [and] public defamation of character" in an effort to interfere with the twenty-four hour demonstration conducted by plaintiffs in Lafayette Park. Complaint at ¶ 20.

Plaintiffs contend that *The Washington Times*, through its editors, reporters, and commentators, has engaged in a campaign to discredit plaintiffs, their political convictions, and their chosen mode of First Amendment expression. To this end, plaintiffs allege, the *Times* has "repeatedly" published articles and cartoons that

> portray a distorted picture of plaintiffs' presence, words and ideas for the purpose of furthering defendants' collective intent to maliciously, falsely, recklessly, cause public defamation.... [t]hereby ... irresponsibly plant[ing] seeds of untruth and prejudic[ing] readers' minds against plaintiffs.

Complaint at ¶ 75. Plaintiffs refer, in particular, to a series of what they describe as "editorials," accompanied on at least one occasion by a satirical cartoon making oblique reference to two of the plaintiffs, that appeared in the *Times* in February and March of 1983. *See id.* at ¶¶ 45, 47–49. These columns, entitled "Defacing the White House," "Defacing the White House: II," and "Defacing the White House: Update," refer both obliquely and explicitly to several of the plaintiffs and criticize "[t]he garbage that passes for protest signs left night and day" on the White House sidewalk and in Lafayette Park. *See id.* at Exhibit 13. These editorials refer to various plaintiffs as "bums" or "pitiable lunatics." *See id.* at Exhibit 15. The writers denigrate plaintiffs' communicative placards as "gibberish" and "trash." *See, e.g., id.* Plaintiffs characterize these comments as false and defamatory statements of fact.[1]

The complaint alleges that the *Times'* "dissemination of malicious disinformation" has had at least three injurious consequences. First, the newspaper's publications regarding plaintiffs purportedly represent an "intentional infliction of emotional distress." *Id.* at ¶ 78; *see id.* at ¶ 93 ("Count Two"). Second, plaintiffs argue, the publications, taken together, reflect a "smear campaign" intended to injure plaintiffs' reputations and "the pursuit of their lives' work and religious practice." *Id.* at ¶ 79; *see id.* at ¶¶ 93 ("Count Three"), 94, 96. Third, plaintiffs maintain that, through such defamatory publications, the *Times* conspired with the federal defendants, which conspiracy was intended to and did result in the promulgation of federal regulations that interfere with plaintiffs' exercise of their First Amendment rights of expression and association. *See id.* at ¶¶ 20, 95.

In addition to the defamation and emotional distress claims, the complaint alleges that in July of 1985 several of the *Times*

---

1. The complaint makes repeated reference to defamation and libel. *See, e.g.,* Complaint at ¶¶ 51, 72, 92 & 104. Yet in another pleading, plaintiffs appear to disavow any libel claim. *See* Reply to Defendants News World Communications, De Borchgrave and Pak's Motion to Dismiss (hereinafter "Plaintiffs' Opposition") at 13–15. Construing the complaint most favorably to plaintiffs, however, it is assumed for purposes of this Memorandum that they do allege libel by *The Washington Times*.

defendants, joined by defendant Masty and defendant organization YAF, were involved in a physical assault against plaintiffs and their property in Lafayette Park. *See id.* at ¶¶ 58–61. Plaintiffs maintain, further, that the *Times* itself organized and implemented the alleged raid in an effort to generate a news story for publication. *See id.* at ¶¶ 59, 61. The raid itself is claimed to have been carried out for the "purpose of removing plaintiffs' signs from the park and, [sic] striking fear into the hearts of plaintiffs *so that plaintiffs might abandon*" their demonstration. *Id.* at ¶ 58.

The complaint alleges that the "raid" occurred at 4:00 A.M. on July 4, 1985. Plaintiffs claim that they were attacked in the park by a group of "abusive and intimidating" persons who destroyed or damaged several of plaintiffs' signs. *Id.* at ¶ 60. This group, purportedly, also attempted to remove several signs from the park using a van driven by defendant Young. Members of the group allegedly erected signs of their own where plaintiffs' had stood. *Id.*

Not only did the alleged assault result in damage to property and injury to person, plaintiffs claim, but the "raid" generated further defamation of plaintiffs in *Times* publications. Plaintiffs contend that a news story about the incident, published on July 5, 1985 under the byline of defendant Masty, contained an "intentionally misleading" account of the event, which article, plaintiffs claim, erroneously characterized the YAF as "Freedom Fighters" while labelling plaintiffs as "weirdos" and "screwballs." *Id.* at ¶ 61. Maintaining that none of their number is or has ever been a member of any Communist or Socialist party, nor "even 'the screwball left,' " plaintiffs conclude that the *Times* defendants took advantage of the assault further to defame plaintiffs. *Id.* at ¶ 62.

### III.

Plaintiffs seek to state a cause of action against the *Times* defendants, individually and in conspiracy with the federal defendants, under 42 U.S.C. §§ 1983, 1985(3) and/or 1986. *See, e.g., id.* at ¶¶ 75, 78–86. In addition, the complaint attempts to assert common law libel and assault claims against various defendants.

Defendants have filed a motion to dismiss resting on numerous grounds. For the reasons discussed in this Memorandum, an accompanying Order grants the *Times* defendants' motion. *The Washington Times* cannot be held liable for money damages to individuals whom the newspaper's editors criticize in published opinions, no matter how vituperative that criticism. Even if the First Amendment could tolerate such an action, plaintiffs here have failed to state a claim under 42 U.S.C. §§ 1983, 1985(3), or 1986. Moreover, plaintiffs' common law libel claim, and the assault claims arising out of the alleged "raid" in Lafayette Park, are barred by the District of Columbia statute of limitations which explicitly provides only one year in which to file actions for these and other torts of this nature, including plaintiffs' claim for intentional infliction of emotional distress. The limitations period expired in July of 1986. These flaws prove fatal to plaintiffs' entire action against the *Times* defendants.

In addition to these three grounds, defendants move to dismiss on several alternative theories: that service of process against them was insufficient; that, because plaintiffs fail to state their claim under federal civil rights statutes, this Court lacks subject matter jurisdiction over the pendent common law claims; that the complaint fails to state a claim for any of its common law tort theories; and that the organizational plaintiffs lack standing to bring this action. Since the accompanying Order's rulings on the first three grounds are dispositive, it is unnecessary to address the several alternative grounds advanced for dismissal.

### A.

In setting forth both the libel claim against *The Washington Times* and the claim that the newspaper has conspired to infringe plaintiffs' First Amendment rights, the complaint focuses on newspaper editorials and cartoons critical of plaintiffs and of their chosen form, substance, and location of expression. Plaintiffs' def-

amation allegation rests on "misrepresentations" about plaintiffs purportedly contained in those publications.

It is apparent from plaintiffs' allegations that, in essence, they charge the *Times* with vigorous espousal of a political position contrary to plaintiffs'. The complaint contends that the newspaper has criticized sharply, and in uncomplimentary terms, plaintiffs' expressive activity in front of the White House and in Lafayette Park. But it is a core purpose of the First Amendment to protect the newspaper's right to publish even vituperative editorials, hostile cartoons, and news articles critical of opponents in a political debate. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 257–58, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974); *Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984) (*en banc*), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

The consequences of this principle for plaintiffs' action here are twofold. First, recognition of the editorial statements at issue as constitutionally protected expression in their own right compels a conclusion that the newspaper cannot be held liable for damages arising from actual or perceived injury to those who are criticized or even ridiculed within that speech. Second, recognizing the statements' constitutional status leads to rejection of plaintiffs' conspiracy claims under 42 U.S.C. §§ 1983 and 1985(3).

### (1)

■ Plaintiffs primarily challenge statements made about them, overtly and obliquely, in articles denominated as "editorials." *See* Complaint at ¶¶ 47–51. Defendants contend that the *Times'* statements, unlike typical news reports, are nothing other than statements of opinion by the newspaper and its managers. *See Times'* Motion to Dismiss at 29–31.[2]

If opinion, the statements' constitutional protection rests on what has been termed the "common ground" of First Amendment doctrine:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

*Gertz v. Robert Welch, Inc.*, 418 U.S. at 339–40, 94 S.Ct. at 3007. Accordingly, statements of opinion enjoy absolute protection under the First Amendment. *Ollman v. Evans*, 750 F.2d at 975.

■ Reasonable minds can differ as to whether a particular statement expresses opinion or fact. *See Ollman v. Evans*, 750 F.2d at 978. The distinction between the two, however, has been understood to present a question of law to be resolved through analysis of the totality of circumstances surrounding the statement itself. *Id.* at 978–79. To aid courts in discerning opinion from fact, the *Ollman* plurality established a four-factor test. Those factors include 1) whether the "common usage or meaning" of the statements is precise or ambiguous, since readers are more likely to recognize ambiguous statements as opinion; 2) whether the statement is verifiable, since opinion is more likely than fact to be unverifiable; 3) what is the linguistic context of the statement in the publication; and 4) what is the broad context in which the statement is published. *Ollman v. Evans*, 750 F.2d at 979–84.

■ Although plaintiffs contend that *Times* publications contain not opinion but false statements of fact, analysis of the publications at issue under the *Ollman* criteria compels the conclusion, under the totality of circumstances, that the *Times'* statements express opinion and not fact. Referring to language used in the editorials to denigrate their anti-nuclear demon-

---

**2.** The *Times* defendants address only those statements at issue that were published in 1984 and after. Defendants contend that all other articles mentioned by plaintiffs were published more than three years before the filing of the 1987 action and, thus, fall outside even of D.C.'s longest limitations period of 3 years. *Times'* Motion to Dismiss at 31 n. 10. This Memorandum considers statements appearing in all of the challenged publications, dating back to 1983, for the purpose of its analysis of plaintiffs' libel claim.

stration, plaintiffs maintain that none of the "signs which [they have] used during the course of [their] communicative activities in Lafayette Park have ever contained 'gibberish' ... been 'unAmerican,' or been 'trash.'" Complaint at ¶ 46. Moreover, plaintiffs assert, the editorials contain such misrepresentations as the claim that plaintiffs' signs are "a continuing insult, mocking the true intent behind the precious right of citizens to petition the government for the redress of grievances." *Id.* at ¶ 47. Finally, plaintiffs deny that they are "'bum[s],' ... 'pitiable lunatic[s],' 'deluded,' or 'insane.'" *Id.* at ¶ 50. Plaintiffs conclude that:

> [their] continuous presence in front of the White House is a fact which existed. Plaintiffs allege that the nature of that fact was of broad public concern, and that defendants intentionally distorted that fact.

Plaintiffs' Opposition at 14.

However harsh these allegedly defamatory statements sound, the "common usage and meaning" of the language used here is not to communicate fact. To refer to a political opponent's message and means of expression as "gibberish," "garbage," or "trash" is not to make definite and unambiguous statements "laden with factual content" such as may support a defamation action. *See Ollman v. Evans,* 750 F.2d at 980.

Similarly, the statements at issue are not "verifiable." A charge that plaintiffs' signs are "unAmerican," for example, is not objectively capable of proof or disproof. *See id.* at 981. Like the label "fascist" at issue in *Buckley v. Littell,* 539 F.2d 882 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977), the analysis supporting which decision informs the *Ollman* test, the label "unAmerican" cannot be regarded as expressing a statement of fact "because of the tremendous imprecision of the meaning and usage of [the] term[ ] in the realm of political debate." *Ollman v. Evans,* 750 F.2d at 980, *quoting Buckley v. Littell,* 539 F.2d at 893. Because of this imprecision, there can be no "clear method of verification with which to evaluate" the truth or falsity of terms used by *Times* commentators to describe and to criticize plaintiffs. *Ollman v. Evans,* 750 F.2d at 981, *citing Buckley v. Littell, supra.*

Moreover, both the immediate, linguistic context and the overarching social and political setting of the *Times'* statements contribute to their definition here as opinion rather than fact. As plaintiffs themselves recognize, *see* Complaint at ¶¶ 45, 47, & 49, the challenged statements appeared, for the most part, in newspaper editorials, thus in a genre typically understood as a vehicle for the expression of opinion. As explained in *Ollman,*

> [t]he reasonable reader who peruses ... [a] column on the editorial or Op–Ed page is fully aware that the statements found there are not "hard" news like those printed on the front page or elsewhere in the news sections of the newspaper. Readers expect that columnists will make strong statements, sometimes phrased in a polemical manner that would hardly be considered balanced or fair elsewhere in the newspaper.

*Ollman v. Evans,* 750 F.2d at 986, *citing National Rifle Association v. Dayton Newspaper, Inc.,* 555 F.Supp. 1299, 1309 (S.D.Ohio 1983). It is true that editorials can and do contain statements of fact and that there is no blanket First Amendment privilege for every statement appearing on a newspaper's editorial or Op–Ed page. *See Ollman v. Evans,* 750 F.2d at 987 n. 33. Nevertheless, the linguistic context of the statements challenged here, *see, e.g.,* Complaint, Exhibits 12, 13 & 15, as well as their publication in a forum whose traditional function is broadly understood to be the communication of opinion, compel the conclusion that the language of the *Times'* harsh descriptions of plaintiffs was "being used in a metaphorical, exaggerated or even fantastic sense." *Ollman v. Evans,* 750 F.2d at 982.

The broad social and political context in which these statements appeared also lends to their definition as opinion rather than fact. The editorials at issue reflect the fact that *The Washington Times* has

adopted a political position contrary to plaintiffs': the newspaper's espousal of its position, and of its opposition to plaintiffs', partakes of a longstanding tradition of vigorous social and political criticism in the press. A reasonable reader, encountering in a *Times* editorial the charge that plaintiffs were "garbage" or "bums," is not likely to construe these statements as anything other than opinion expressed through exaggerated rhetoric. As was held true of the label "traitor" applied to one who crosses a picket line in the context of a labor dispute, the terms used by the *Times* to criticize plaintiffs must be understood in this context as "loose, figurative" language that expresses opinion. *See Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 284–87, 94 S.Ct. 2770, 2781–83, 41 L.Ed.2d 745 (1974). In this atmosphere of charged political debate, even the newspaper's description of plaintiffs as "insane" persons and as "pitiable lunatics" reflects opinion and not fact—exaggerated epithet, not factual allegation.

Once recognized as expressing opinion and not as conveying fact, the editorial statements at issue here must be accorded absolute protection under the First Amendment. Plaintiffs cannot, consequently, maintain an action for damages resulting from the newspaper's hostile expressions of its opinion concerning plaintiffs' First Amendment activity. *See Ollman v. Evans*, 750 F.2d at 975 & n. 7. To entertain such an action would be to undermine the

> profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks....

*New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964).

### (2)

■ As fundamental to First Amendment doctrine as its absolute protection of opinion is the principle that "there is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418

U.S. at 341, 94 S.Ct. at 340. Under *Ollman's* four-factor test, the statements at issue in this action are best characterized as expressions of opinion rather than fact. Plaintiffs disagree. Yet, even if the publications at issue here were construed to communicate arguably false statements of fact rather than mere expressions of opinion, those statements still would not constitute "libel" or "defamation" such as would allow plaintiffs to maintain this action against *The Washington Times*.

Plaintiffs cannot claim to be private individuals: they are "public figures," defined, for the purpose of libel doctrine, as those who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.... [T]hey invite attention and comment." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 94 S.Ct. at 3009. Plaintiffs' twenty-four hour vigil in Lafayette Park takes place in possibly the most conspicuous public forum in the Nation. Their outspoken advocacy of their political and religious views thrives and, indeed, depends on significant and constant attention by the public. They have engaged in a running contest with law enforcement authorities with the result, if not the intention, of attracting considerable media attention. The complaint, in fact, asserts that the alleged violations of plaintiffs' rights have resulted in "direct injury to plaintiffs by alienating them from a substantial portion of the general public." Complaint at ¶ 94. Plaintiffs contend, further, that defendants' actions

> cause[d] [plaintiffs] to lose esteem in the eyes of the general public to whom plaintiffs were attempting to communicate in regard to an issue of broad public concern.

Complaint at ¶ 103.

Defined as "public figures," plaintiffs must satisfy the stringent standard for maintaining libel actions established in *New York Times v. Sullivan, supra*, with respect to public officials, and extended to nonofficial "public figures" in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 *reh'g denied*, 389

U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197 (1967). In order to maintain a libel claim against *The Washington Times*, plaintiffs would need to show, by clear and convincing evidence, 1) that the statements at issue were false; and 2) that the *Times* made those statements with "actual malice," "that is, with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *New York Times v. Sullivan*, 376 U.S. at 280, 84 S.Ct. at 726; *see Gertz v. Robert Welch, Inc.*, 418 U.S. at 343, 94 S.Ct. at 3008.

■ The complaint asserts but does not support an allegation of actual malice on the part of *The Washington Times* or of those individuals responsible for the editorial policy of the newspaper. *See, e.g.,* Complaint at ¶¶ 93, 101 & 102. Plaintiffs maintain that defendants either knew of purported inaccuracies in the statements at the time of publication or disregarded the possibility of inaccuracy, making no effort to determine the validity of the comments published. Complaint at ¶ 101. Plaintiffs conclude that publication of the allegedly false statements in question was motivated by malice towards plaintiffs, Complaint at ¶ 102, and, thus, constitute libel for which the newspaper may be sued for damages, *id.* at ¶ 104–106.

Plaintiffs employ the word "malice" as an empty epithet, devoid of factual content. For instance, plaintiffs allege that "the *Washington Times* has intentionally and tortiously acted to plant and re-enforce [sic] a false, malicious, hateful, contemptuous, and prejudiced image of plaintiffs in the mind of Ronald Wilson Reagan...." *Id.* at ¶ 96. Plaintiffs allege, further, that:

defendants acted willfully and maliciously, with reckless disregard to promote their fearful arguments for nationalistic elitism through superior firepower over plaintiffs' peaceful argument for human co-existence through cooperation. Defendants distorted reason and truth to cause direct injury to plaintiffs by alienating them from a substantial portion of the general public, and to represented [sic] plaintiffs' expressions as the "delusions of the insane." Defendants also

sought to make their own weaker arguments appear stronger throught [sic] the defamation of plaintiffs' character. Defamation in lieu of dialogue is totally outrageous and unacceptable to a civilized society.

*Id.* at ¶ 94.

Plaintiffs may well confuse political opposition with malice. Some of the editorial language referring to "garbage," "bums," and "lunatics" is certainly strong. Yet, such language reflects not actionable malice but, rather, the timbre of argument characteristic of a robust political press addressing public figures like plaintiffs. As recognized in *Ollman:*

Perhaps it would be better if disputation were conducted in measured phrases and calibrated assessments, and with strict avoidance of the ad hominem; better, that is, if the opinion and editorial pages of the public press were modeled on The Federalist Papers. But that is not the world in which we live, ever have lived, or are ever likely to know, and the law of the first amendment must not try to make public dispute safe and comfortable for all the participants.

*Ollman v. Evans,* 750 F.2d at 993 (Bork, J., concurring).

The complaint lacks any colorable claim that *The Washington Times* published the challenged statements with actual malice. Thus, the complaint fails to state a claim that would satisfy the *New York Times v. Sullivan* standard governing common law libel actions against *The Washington Times*.

### B.

In addition to their libel claim against *The Washington Times*, which cannot lie on the facts plead, plaintiffs seek relief from the *Times* defendants pursuant to 42 U.S.C. §§ 1983, 1985(3), and 1986. Plaintiffs' claims cannot survive defendants' motion to dismiss for failure to state a claim under these federal civil rights statutes. *See Times'* Motion to Dismiss at 11–12.

**(1)**

42 U.S.C. § 1983 provides persons within the United States with a right of action against

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected [another person] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws....

42 U.S.C. § 1983. Two elements are necessary for recovery under this provision. First, a plaintiff must show that a defendant has deprived him or her of a right secured by the "Constitution and laws" of the United States. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). Second, a plaintiff must show that a defendant acted "under color of" the law of a state, territory, or the District of Columbia. *Id., citing Monroe v. Pape*, 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961).

■■■ The allegations appearing in the complaint here cannot satisfy the first requirement imposed under § 1983. Plaintiffs name the *Times* defendants primarily in counts alleging common law torts, such as assault, intentional infliction of emotional distress, and libel. *See* Complaint at ¶¶ 92, 93, 100. Neither the Constitution nor any laws contemplated under § 1983 establishes a "right" or "privilege" to be free from libel or assault *qua* assault. Moreover, where state law does not extend any legal guarantee of the present enjoyment of one's reputation, beyond providing a remedy in tort for damage thereto, defamation by a state official does not result in a deprivation of "liberty" or "property" protected by Fourteenth Amendment. Consequently, no action under § 1983 may lie for plaintiffs' assault, defamation, and libel claims. *See Paul v. Davis*, 424 U.S. 693, 711–12, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405, *reh'g denied*, 425 U.S. 985, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976).

Even if the common law torts allegedly committed by the *Times* defendants did operate to deprive plaintiffs of· a "right, privilege[ ], or immunit[y]" cognizable under § 1983, the complaint alleges no acts taken by the *Times* defendants "under color of" any state or District of Columbia law. Accordingly, the complaint fails to satisfy the second criterion established for § 1983 actions in *Adickes v. S.H. Kress & Co., supra.*

Plaintiffs have failed to refute the contention that a § 1983 action against the *Times* defendants cannot lie on the facts plead. Plaintiffs acknowledge that the motion to dismiss contains arguments pertaining to § 1983 in particular; however, plaintiffs' opposition to the motion to dismiss addresses only 42 U.S.C. § 1985(3) and case law interpreting and applying that provision. *See* Plaintiffs' Opposition at 6. Although plaintiffs have not engaged defendants' arguments on this issue, an independent evaluation of § 1983 and the relevant law in this Circuit compels the conclusion that defendants are correct. Plaintiffs have neither alleged, nor factually supported, an allegation, that all or any of the *Times* defendants acted under color of state or District of Columbia law to deprive plaintiffs of any right, privilege, or immunity secured by the Constitution or laws. Accordingly, the complaint fails to state a claim against any *Times* defendant upon which relief can be granted under 42 U.S.C. § 1983.

**(2)**

The complaint alleges not only that the *Times* defendants committed common law torts against plaintiffs, but also that the *Times* defendants conspired with the federal defendants to deprive plaintiffs of rights secured to them by the First Amendment. Plaintiffs claim a right of action for the alleged conspiracy both under 42 U.S.C. § 1983 and under 42 U.S.C. § 1985(3).

Neither the complaint nor any other pleading submitted by plaintiffs in this action differentiates their conspiracy claims as between these statutory provisions, although case law interpreting the two emphasizes their distinctive histories and standards for application. Defendants move to dismiss plaintiffs' conspiracy claims under both § 1983 and § 1985(3) on the grounds

that the complaint fails to state a claim under either provision upon which relief can be granted. *Times'* Motion to Dismiss at 15–20. An independent analysis of §§ 1983 and 1985(3) leads to the conclusion that defendants are correct: the accompanying Order dismisses the complaint's conspiracy counts against all *Times* defendants.

*(a)*

Plaintiffs' attempts to state a conspiracy claim under 42 U.S.C. § 1983 fail for several reasons. First, as defendants argue, the complaint does not plead plaintiffs' conspiracy claims under § 1983 with sufficient specificity. *See Times'* Motion to Dismiss at 15–16. In *Hobson v. Wilson,* 737 F.2d 1 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), this Circuit articulated a heightened pleading standard demanding especial particularity in civil rights complaints. *See id.* at 30.[3] The *Hobson* court quoted with approval the Second Circuit's pleading requirement for such actions:

> "Complaints containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed.... Diffuse and expansive allegations are insufficient...."

*Id., quoting Ostrer v. Aronwald,* 567 F.2d 551, 553 (2nd Cir.1977); *see Hobson v. Wilson,* 737 F.2d at 30 & n. 87 (supporting with citations the claim that "every other circuit" requires civil rights complaints to be plead with specificity); *see also Martin v. Malhoyt,* 830 F.2d 237, 258 (D.C.Cir.), *reh'g denied,* 833 F.2d 1049 (1987). The complaint here contains only conclusory allegations of a § 1983 conspiracy between the *Times* and federal defendants to deprive plaintiffs of First Amendment rights;

plaintiffs fail to support their claims with reference to material facts.

Even were the complaint construed to assert nonconclusory and factually supported allegations of a conspiracy under § 1983, it would yet fail to satisfy the *substantive* criteria governing claims under that provision.

Private parties like the *Times* defendants, whose actions might not otherwise be taken "under color of state law," may be subject to suit under § 1983 if they conspire with government officials to deprive others of their constitutional rights. *See Adickes v. S.H. Kress & Co.,* 398 U.S. at 152, 90 S.Ct. at 1606. The complaint here names only *federal* officials as the private defendants' alleged co-conspirators. Because actions of the federal government itself, and of its officers, lie beyond the purview of § 1983, *District of Columbia v. Carter,* 409 U.S. 418, 424, 93 S.Ct. 602, 606, 34 L.Ed.2d 613, *reh'g denied,* 410 U.S. 959, 93 S.Ct. 1411, 35 L.Ed.2d 694 (1973), § 1983 actions for alleged conspiracies involving private parties and federal officers are recognized only when the conspiracy charged also involves state or local officials. *See, e.g., Hampton v. Hanrahan,* 600 F.2d 600, 623 (7th Cir.1979), *reversed in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670, *reh'g denied,* 448 U.S. 913, 101 S.Ct. 33, 65 L.Ed.2d 670 (1980). Plaintiffs allege no such conspiracy here.

Moreover, an action for conspiracy to violate § 1983 depends, as does a simple § 1983 action, upon a showing that the acts of which plaintiffs complain were taken "under color of state law." Plaintiffs' allegation that the *Times* defendants conspired with federal officials to promulgate regulations infringing plaintiffs' First Amendment rights describes a conspiracy which could only have proceeded "under color of"

---

**3.** Although *Hobson* involved claims brought under 42 U.S.C. § 1985(3) rather than under § 1983, the pleading standard adopted there has been generally applied to conspiracy complaints brought under any of the civil rights statutes. *See, e.g., Slotnick v. Staviskey,* 560 F.2d 31, 33 (1st Cir.1977), *cert. denied,* 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978) (§ 1983 com-

plaint's conclusory allegations of conspiracy, unsupported by material facts, could not survive motion to dismiss). Moreover, *Hobson* claims to have borrowed its own pleading standard, in part, from decisions in which other circuits addressed claims arising under § 1983. *See Hobson v. Brennan,* 737 F.2d at 30 n. 87 (citing cases).

*federal* law.[4] Section 1983 provides no relief against persons acting under color of federal law. *See Wheeldin v. Wheeler,* 373 U.S. 647, 652, 83 S.Ct. 1441, 1445, 10 L.Ed. 2d 605 (1963). Thus, even had plaintiffs named state or D.C. officials as co-conspirators with the named *Times* and federal defendants, the complaint would still fall short of § 1983's requirement that the alleged conspiracy have taken place under color of *state* law.

### (b)

Plaintiffs' conspiracy claims similarly fail to satisfy the standards governing actions under 42 U.S.C. § 1985(3). That section provides, in pertinent part, that

[i]f two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... [and,] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). Unlike § 1983, an action for damages under § 1985(3) does not require a showing that the acts complained of were taken "under color of state law." *Hobson v. Wilson,* 737 F.2d at 14, *citing Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Yet, again unlike § 1983, § 1985(3) vindicates only that "conspiratorial tortious interference with the rights of others ... [that is]

motivated by some class-based, invidiously discriminatory animus." *Martin v. Malhoyt,* 830 F.2d at 258, *quoting Hobson,* 737 F.2d at 14; *see Griffin v. Breckenridge,* 403 U.S. at 102, 91 S.Ct. at 1798.

Defendants argue that the complaint portrays plaintiffs as a group sharing a particular political perspective rather than a racial or ethnic trait such as typically identifies a "class" for the purpose of § 1985(3). *Times'* Motion to Dismiss at 17. Defendants maintain, further, that the complaint characterizes their actions as arising out of political differences with plaintiffs rather than as being motivated by invidious, class-based animus. *Id.* Section 1985(3) does not reach conspiracies motivated by economic or commercial animus. Nor has it been extended to reach conspiracies motivated by political animus. *United Brotherhood of Carpenters and Joiners of America, Local 610 v. Scott,* 463 U.S. 825, 836–39, 103 S.Ct. 3352, 3360–62, 77 L.Ed.2d 1049 (1983). Defendants contend that plaintiffs have failed to bring their § 1985(3) conspiracy claim within that statute's limited scope.

Plaintiffs urge, in opposition, that although much of the complaint charges defendants with "animus to squelch [plaintiffs'] free expression," Plaintiffs' Opposition at 10, it also contains "ample" allegations that "at least some defendants have also been motivated by religious animus." *Id.* Plaintiffs invoke *Ward v. Connor,* 657 F.2d 45, 47–48 (4th Cir.1981), *cert. denied sub nom. Mandelkorn v. Ward,* 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982), in which injured members of the Unification Church were permitted to sue under the civil rights conspiracy provision because "religious discrimination, being akin to invidious racial bias, falls within the ambit of § 1985(c) [sic]." *Id.* at 48; *see also Hobson v. Wilson,* 737 F.2d at 21 (citing cases in other circuits that extend § 1985(3) to protect political and religious

---

**4.** Plaintiffs appear to concede this point. In describing the "nature" of their 1987 action, plaintiffs allege that "[t]he intention of the conspiracy was to utilize regulatory schemes ... and to encourage public support for regulations under the color of which defendants have deprived plaintiffs of rights and privileges guaranteed under the Constitution of the United States." Complaint at ¶ 20. The "regulations" to which plaintiffs refer are, of course, federal regulations, codified at 36 C.F.R. § 7.96.

classes). Plaintiffs, as a group, thus appear to rely most heavily on a characterization of themselves as a religious rather than a political "class"—and, accordingly, on a characterization of the alleged torts against them as being motivated by religious rather than political animus—for the purpose of their § 1985(3) claims.

The question of whether plaintiffs constitute a religious class remains undecided in this Circuit. Indeed, in dismissing five criminal informations, several of which involved individual plaintiffs in the present action and arose out of the same expressive activities at issue here, the district court assumed that appellees' anti-nuclear vigil in Lafayette Park was the product of sincerely held religious beliefs. *United States v. Galindez*, Cr. No. 87–60, slip op. (D.D.C. Apr. 23, 1987), *rev'd and remanded on other grounds*, Nos. 87–0060, 87–0061, 87–0062, 87–0063, & 87–0064 (D.C.Cir. Sept. 22, 1987).

Nonetheless, even assuming that plaintiffs have successfully identified themselves as a religious group, it does not follow that the complaint alleges, with sufficient specificity, that any of the defendants have been motivated by "invidiously discriminatory animus" against plaintiffs based on that religious identification. *Hobson v. Wilson* has established that,

> in cases involving a claim that defendants acted with an unconstitutional motive, we will require that nonconclusory allegations of evidence of such intent must be present in a complaint....

*Hobson v. Wilson*, 737 F.2d at 29. Plaintiffs' failure to satisfy this criterion extends as well to their claim that the *Times* conspired with members of the YAF to plan and execute a "raid" on plaintiffs in Lafayette Park with the intent violently to interfere with plaintiffs' exercise of their First Amendment rights. The complaint does not allege, with sufficient specificity, that the *Times* defendants acted in concert with the YAF out of racial or religious bias or out of any invidious, class-based animus recognized under § 1985(3).

A review of those paragraphs of the complaint relied on by plaintiffs to support their allegation that defendants acted with actionable animus, *see* Plaintiffs' Opposition at 10, reveals that the complaint fails to satisfy the *Hobson* specificity criteria with respect to that element of a § 1985(3) conspiracy claim.

Paragraph 21, for instance, states that plaintiffs perceive the purportedly "false and defamatory misrepresentations" of defendants as a menace to "their freedoms of belief and expression." Complaint at ¶ 21. Yet, although they imply that their *religious* beliefs would suffer the threatened injury, plaintiffs describe defendants' alleged defamation as being "invidiously animated by religious *and/or* political bias." *Id.* (emphasis supplied). Similarly, paragraph 29 asserts that defendants "conspired to place administrative policy above the law" that, "in theory," prohibits the use of "police power ... to stifle religious exercise *or* mute political dissent." *Id.* at ¶ 29 (emphasis supplied). Paragraph 78, in turn, identifies an injury to plaintiffs' "religious practice" but fails even to mention any possible religious animus in defendants that might have motivated or contributed to the injury alleged. *Id.* at ¶ 78. Again, in paragraph 79, plaintiffs claim injury to their "religious practice" but imply that one defendant's motivation may be inferred from his "supervisory responsibility for a ... smear campaign against those opposed to Reverend Moon's suicidal *economic* interests." *Id.* at ¶ 79 (emphasis supplied). Paragraph 89 does expressly allege that defendants were motivated by religious animus; however, that same paragraph charges also that they were motivated by "personal prejudice ... or cultural animus." Plaintiffs fail to specify any evidence that would support any of these allegations. *Id.* at ¶ 89. Paragraph 90 alleges only that "[d]efendants opposed plaintiffs' message in their official (political) capacities, and/or in their personal (religious, social) capacities." *Id.* at ¶ 90. Paragraph 91 makes no mention of defendants' motivation at all. It alleges merely that they disagree with plaintiffs on religious issues. *Id.* at ¶ 91. Finally, paragraph 93, while alleging that defendants acted "with willful, malicious, and reckless disregard to

disrupt the practice of plaintiffs' chosen profession and religion," does not allege that any such action was motivated by invidious animus based on plaintiffs' membership in a particular religious class. *Id.* at ¶ 93; *see Martin v. Malhoyt,* 830 F.2d at 258.

■ Even if the complaint were construed to allege a conspiracy motivated by invidious, class-based animus, the claims under §§ 1983 and 1985(3) could not withstand the *Times* defendants' motion to dismiss. It is well established that a plaintiff suing under these statutes must allege and prove four basic elements: 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his or her person or property or deprived of any right or privilege of a United States citizen. *Martin v. Malhoyt,* 830 F.2d at 258, *quoting Hobson v. Wilson,* 737 F.2d at 14.

Plaintiffs contend that the complaint alleges, with sufficient specificity, each element of a § 1985(3) conspiracy claim. *See* Plaintiff's Opposition at 8–10. To satisfy the "purpose" prong of the conspiracy test, plaintiffs rely on paragraph 20 of the complaint, which alleges that the "intention of the conspiracy" was to utilize, *inter alia,* the various Lafayette Park regulations, "disinformation," and "public defamation of character" to encourage public support for the regulations that purportedly infringed plaintiffs' First Amendment rights,

as well as to "aggrandize [defendants'] political opposition" to plaintiffs' twenty-four hour vigil. *Id.* at 9.

Plaintiffs cite Exhibits 12 and 13, appended to the complaint, as containing "references to specific material facts" supporting an inference of an intent among defendants to conspire against plaintiffs. *Id.*[5] Both exhibits are copies of editorials critical of plaintiffs that were published by *The Washington Times* and discussed extensively above. Plaintiffs infer from the editorials that "for years these defendants have been opposed to plaintiffs' high-profile, 24–hour, year-around, anti-nuclear vigil[.]" *Id.* Yet, while plaintiffs, by means of these exhibits, describe a specific attitude that defendants may have held towards plaintiffs' expressive activity, plaintiffs fail to allege sufficiently particular facts that would support an inference that such an attitude ever ripened into an *intent* to conspire with federal officials illegally to infringe plaintiffs' constitutional rights in violation of federal civil rights laws.

Similarly, while plaintiffs suggest that the *Times* defendants actually did conspire with each other and with the federal defendants to violate plaintiffs' First Amendment rights, plaintiffs support that inference with facts no more specific than the allegation that

[i]n the period between February, 1983 up to and including the promulgation of the White House sidewalk regulation, on June 17, 1983, agents of the Park Service ... were in contact with agents of the

---

5. It is noteworthy that plaintiffs do not elaborate or support their passing allegation that the *Times'* purported role in the "raid" evidences the newspaper's intent with respect to the alleged conspiracy with the federal defendants. *See* Complaint at ¶¶ 58–61. Plaintiffs suggest that a reasonable jury could infer that defendant Masty and a photographer "were on the scene by concerted pre-arrangement as journalistic tools of a propagandistic conspiracy intended to alienate plaintiffs and their ideas from the public, as well as to deprive them of constitutionally protected rights under color of regulation...." Plaintiffs' Opposition at 2. Yet the complaint itself asserts that the *Times* participated in the raid "for the agreed upon purpose of striking fear into the hearts of plaintiffs so

that plaintiffs might abandon their expressly-permitted and lawfully-conducted activity in Lafayette Park." Complaint at ¶ 58. Moreover, the complaint claims that the *Times* engineered the raid "in pursuit of said 'good' copy for its 'patriotic' 4th of July editions [sic]," and that the newspaper then published an account that "defamatorily portrayed [plaintiffs] as 'weirdos' and 'screwballs.'" Complaint at ¶ 61. The complaint, therefore, links the *Times'* alleged participation in the raid to plaintiffs' defamation and assault claims, but omits any specific, factually supported allegation that the newspaper participated in the raid with the intent to deprive plaintiffs of their First Amendment rights through the alleged conspiracy with the federal defendants.

*Washington Times.* Various *Times* articles quoted false statements which were attributed to various Park Service agents. Defendant Robbins admitted having used those articles and editorials as partial justification for the White House sidewalk regulations.

Complaint at ¶ 47; *see also id.* at ¶ 51 (claiming that one federal defendant's comment about White House sidewalk regulations reflects "adverse impacts" of the *Times'* uncomplimentary portrayal of plaintiffs); *id.* at ¶ 58 (alleging without elaboration that "[i]n executing the alleged civil conspiracy," two of the nonfederal defendants "had a meeting of the minds").

Suggesting next a focus on the third element of *Hobson*'s conspiracy test, plaintiffs claim that the *Times* defendants committed an act in furtherance of the alleged conspiracy by publishing editorials and the like calling for regulation of demonstrations in Lafayette Park. Plaintiffs' Opposition at 9.

Fourth, and finally, plaintiffs attempt to establish that they suffered a deprivation of their First Amendment rights as a result of the alleged conspiracy. Complaint at ¶ 78. To satisfy this element of the *Hobson* test, plaintiffs rely heavily on a fragmentary transcript of a deposition of federal defendant Robbins purportedly taken in 1983 during discovery in another action. *See id.*, Exhibit 16. The transcript reveals that Mr. Robbins, who was involved in the Department of the Interior's promulgation of the regulations at issue, admitted to having read editorials in *The Washington Times* which were "critical of some of the activities that have taken place on the White House sidewalk." *Id.* Plaintiffs contend that the complaint, when read in conjunction with Exhibit 16, specifically supports the inference that one of the Department of the Interior defendants was unduly influenced by critical *Times* editorials, resulting in injury to plaintiffs' First Amendment rights.

Plaintiffs' allegations establish little more than the probability that those promulgating the regulations at issue read newspapers and consider the opinions expressed therein when calculating public response to a proposed rule. Thus, the constitutional analysis that precludes plaintiffs' common law libel claim against the *Times* defendants also compels rejection of plaintiffs' claims, under 42 U.S.C. §§ 1983 and 1985(3), that the *Times* defendants conspired with the federal defendants to infringe plaintiffs' First Amendment rights. Plaintiffs contend that the *Times* published the editorials at issue in order to encourage the federal defendants to promulgate regulations restricting plaintiffs' activities in Lafayette Park and in front of the White House. Plaintiffs infer a conspiracy among the defendants from the fact that the regulations were eventually promulgated by defendants serving in the Department of the Interior.

Once the *Times* editorials are recognized as an exercise of the newspaper's own First Amendment freedom, however, the "conspiracy" inferred by plaintiffs is reduced to nothing more than communication directed by the newspaper's editors towards federal officials responsible for policy in an area of particular concern to those editors. The possibility that that communication was *effective*, that is, that it reached its intended federal audience and ultimately influenced decisionmakers, fails to convert communication into conspiracy. It would turn the First Amendment on its head to discern a civil rights conspiracy from newspaper editorials designed to persuade public officials to take action of the sort at issue here.

Finally, if the *Times'* editorials exerted an inappropriate influence on any or all of the federal defendants, or if any illegal use was made of the statements or information contained in those editorials, only those who misused the newspaper's communications, and not the newspaper itself, are potentially answerable for damages here.

In conclusion, it cannot be said that the complaint sets forth 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the

conspiracy; 4) whereby a person is either injured in person or property or deprived of any right or privilege of a citizen of the United States. *Hobson v. Wilson*, 737 F.2d at 14. Accordingly, the complaint fails to state a claim under § 1983 and § 1985(3).

### C.

■ Defendants argue that plaintiffs may not maintain an action under 42 U.S.C. § 1986 unless they state a sufficient cause of action under 42 U.S.C. § 1985. *Times'* Motion to Dismiss at 22. Plaintiffs do not traverse defendants' arguments on this issue; rather, plaintiffs reiterate their position that they have indeed stated a valid claim under § 1985. Plaintiffs' Reply at 13.

Section 1986 provides a right of action for damages against a person who,

> having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this Title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do if such wrongful act be committed....

42 U.S.C. § 1986. The language of this provision establishes unambiguously that a colorable claim under § 1985 is a prerequisite to stating an adequate claim for neglect to prevent under § 1986. *See Mollnow v. Carlton*, 716 F.2d 627, 632 (9th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 126, *reh'g denied*, 466 U.S. 954, 104 S.Ct. 2162, 80 L.Ed.2d 547 (1984). Plaintiffs have failed to state a claim under § 1985. Accordingly, plaintiffs' claims against defendants under 42 U.S.C. § 1986 should be and are dismissed by the accompanying Order.

### D.

■ Plaintiffs' common law claims against the *Times* defendants are barred here by the District of Columbia's one-year statute of limitations governing actions of

this nature. D.C.Code § 12–301(4); *see Steorts v. American Airlines, Inc.*, 647 F.2d 194, 196 (D.C.Cir.1981), *citing Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). As defendants note, *see Times'* Motion to Dismiss at 23, the most recent tortious act alleged to have been taken by any defendant is the publication of a newspaper column by defendant Masty on July 5, 1985. The present action was filed on July 7, 1987, more than two years after that column appeared.[6]

The complaint itself reflects some ambiguity with respect to the precise torts alleged against the *Times* defendants, which claims appear to cluster in "Counts" II–X. *See* Complaint at ¶¶ 93–106. Nonetheless, as articulated in the complaint, and in the context of the facts alleged, plaintiffs' claims are best construed as charging the *Times* defendants with the common law torts of libel, defamation, intentional infliction of emotional distress, and assault and/or battery, the latter arising out of the purported "raid" on plaintiffs in Lafayette Park. *See Times'* Motion to Dismiss at 25–28 (analyzing each count against *Times* defendants in turn and showing that all essentially allege libel or assault). This characterization of the complaint is compelled notwithstanding plaintiffs' contention that they allege not "libel" but "the dissemination of malicious disinformation [which] has caused plaintiffs injury to the conduct of their lives' work and their religious practice," Plaintiffs' Opposition at 13–14.

■ D.C.Code Ann. § 12–301(4) (1981) specifically provides a one-year limitations period "for libel, slander, assault, [and] battery...." The one-year period has also been imposed to govern actions for torts, like the intentional infliction of emotional distress, that are dependent on "the same personal interests infringed by the intentional torts" expressly subject to § 12–301(4). *Hanoch Tel–Oren v. Libyan*

---

6. Because plaintiffs' claims for assault and battery arising out of the alleged "raid" in Lafayette Park are time-barred, this Memorandum does not reach the serious questions that would be raised if *The Washington Times* were shown to have been a party to the attack or if the newspaper were proven to have engineered the event in order to generate a story damaging to plaintiffs.

*Arab Republic,* 517 F.Supp. 542, 550 (D.D. C.1981), *aff'd,* 726 F.2d 774 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). Here, plaintiffs base their claim for intentional infliction of emotional distress on their allegations that defendants "utilize[d] the *Times* as an instrument with which to plant seeds intended to poison the general public against plaintiffs.... They exposed plaintiffs to the constant threat of physical attack." Complaint at ¶ 93. Plaintiffs' claim for emotional distress is thus completely dependent upon and "intertwined" with their claims for libel, defamation, and assault and/or battery. As such, the emotional distress claim falls subject to the one-year limitations period specifically provided for those intentional torts. *Burda v. National Association of Postal Supervisors,* 592 F.Supp. 273, 281 (D.D.C.1984), *aff'd,* 771 F.2d 1555 (D.C.Cir.1985).

 Moreover, the limitations period governing plaintiffs' claims of civil conspiracy is established by the statute of limitations governing the underlying tort. Thus, the complaint's allegations of a conspiracy by the *Times* defendants to libel and assault plaintiffs are also subject to the one-year period set out in D.C.Code § 12–301(4).

 As defendants note, the limitations period on tort actions such as these typically begins to run on the date of the alleged injury. *Shehyn v. District of Columbia,* 392 A.2d 1008, 1013 (D.C.App. 1978); *see Times'* Motion to Dismiss at 24. Libel actions, similarly, accrue on the date of publication. *See Doe v. United States Department of Justice,* 602 F.Supp. 871, 873 (D.D.C.1983). The statute of limitations in a conspiracy action "runs separately from each overt act that is alleged to cause damage to the plaintiff." *Lawrence v. Acree,* 665 F.2d 1319, 1324 (D.C.Cir. 1981). Accordingly, plaintiffs here could have maintained their conspiracy action only by bringing it within one year of the *last* overt act alleged. Since that act—publication in the *Times* of a column by defendant Masty describing the alleged raid and criticizing plaintiffs, *see* Complaint at ¶ 61—took place on July 5, 1985, plaintiffs cannot bring their conspiracy action now.

Plaintiffs' failure to comply with the D.C. statute of limitations for the torts of intentional infliction of emotional distress, libel, defamation, and assault and battery compels dismissal of those claims against the *Times* defendants.

## IV.

None of plaintiffs' claims for damages arising from alleged constitutional and common law torts can survive defendants' dispositive motion. Accordingly, an accompanying Order grants the *Times* defendants' motion to dismiss and dismisses the complaint as against those defendants.

## ORDER

Defendants News World Communications, De Borchgrave, and Pak have filed a motion to dismiss the complaint as against them. Defendant Jay Young has filed an answer to the complaint and prays for dismissal on grounds identical to those advanced in the motion to dismiss. For this reason, defendant Young is treated for purposes of this Order and in the foregoing Memorandum as having joined the motion to dismiss filed by defendants New World Communications, *et al.*

As more fully stated in an accompanying Memorandum, the First Amendment precludes plaintiffs' action for damages against *The Washington Times* or its editors, employees, or associates for any alleged injury arising out of statements of opinion published in that newspaper. Moreover, plaintiffs have failed adequately to state a claim against these defendants upon which relief can be granted under 42 U.S.C. §§ 1983, 1985(3), or 1986. Plaintiffs' common law claims for libel, defamation, assault and/or battery, and intentional infliction of emotional distress, further, are barred here by the District of Columbia one-year statute of limitations. Accordingly, it is this 23rd day of February, 1988, hereby

ORDERED: that defendants' motion to dismiss should be and is hereby GRANTED; and it is further

ORDERED: that the claims in the complaint against defendants not a party to the News World Communications motion to dismiss and not resolved by this Order should be and are hereby consolidated with pending Civil Action No. 84–3552–LFO.